Amy Jane Longo (SBN 198304)
Amy.Longo@ropesgray.com
ROPES & GRAY LLP
10250 Constellation Blvd.
Los Angeles, California 90067
Telephone: 310-975-3000
Facsimile: 310-975-3400

David B. Hennes (*pro hac vice* to be filed)
David.Hennes@ropesgray.com
Matt Corriel (*pro hac vice* to be filed)
Matt.Corriel@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: 212-596-9000
Facsimile: 212-596-9090

Attorneys for Plaintiff,
NANCY LERNER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NANCY LERNER,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS J. MCMANAMON,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Nancy Lerner, by and through her attorneys, brings this civil action against Thomas J. McManamon and alleges as follows:

## JURISDICTION AND VENUE

1.      This court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000.  Plaintiff is a resident of California, and defendant is a resident of Ohio. The amount in controversy exceeds $238,000.

2.      This court has personal jurisdiction over defendant Thomas J. McManamon including because (i) he sent text and email communications to this District to improperly and fraudulently solicit a $238,000 payment from plaintiff Nancy Lerner; (ii) Ms. Lerner initiated and confirmed the wire payment at issue from this District; and (iii) as a commercial pilot, Mr. McManamon regularly flies to and from this District and regularly stays overnight or longer.

3.      Venue is proper pursuant to 28 U.S.C § 1391 because a substantial part of the events giving rise to this complaint happened in this District.

## NATURE OF THE ACTION

4.      This case exemplifies the maxim that "no good deed goes unpunished." In response to pleas from a friend in need who had been fired from his job, Ms. Lerner paid Mr. McManamon $238,000 in "substitute" severance that she thought his former employer had unfairly denied him.  Little did she know, Mr. McManamon was still pursuing that same severance payment from his former employer.  Shortly after Ms. Lerner wired Mr. McManamon the substitute severance, he succeeded in obtaining the full severance payment he claimed he was owed from his former employer.  Of course, he never told Ms. Lerner that he was still pursuing the severance payment from his former employer or had received it.  And when she discovered by happenstance that Mr. McManamon had received the payment and tried to confront him, he lied to her before cutting off all communications with her. As a result, Ms. Lerner is forced to seek the return of the $238,000 that Mr.

1

McManamon fraudulently obtained from her under false pretenses and has now wrongfully refused to return.

5.     For seventeen years, Mr. McManamon was employed as a private pilot by Five Star Aviation LLC ("Five Star"), a company controlled by certain of Ms. Lerner's family members but in which she has never had any financial interest or control over.

6.     As a result of his own misconduct, Mr. McManamon was fired from Five Star in December 2022.  Upon his termination, Mr. McManamon believed that he was entitled to a severance payment of two years' salary from Five Star, but Five Star only agreed to pay him six months' severance.

7.     Mr. McManamon repeatedly complained to his longtime friend, Ms. Lerner, about the financial difficulties he was facing and what he felt was his unfair treatment by Five Star.

8.     Because Mr. McManamon was her close friend and said he was in financial need, Ms. Lerner told him that if Five Star did not agree to pay him the two years of severance to which he believed he was entitled, then she would pay him the difference between that amount and whatever severance payment he ultimately received from Five Star.

9.     In June 2023, Mr. McManamon—who by then had started a new job—wrote to Ms. Lerner that he had only received six months' severance from Five Star and asked her for the additional severance that she had offered to pay him to make up the difference.

10.    But Mr. McManamon failed to disclose to Ms. Lerner that he was still pursuing the remainder of his severance from Five Star at that time.

11.    Based on Mr. McManamon's deceit, which led her to believe that he was not going to be paid two years' severance from Five Star, Ms. Lerner lived up to her commitment.  She calculated that $237,553 would put Mr. McManamon in the same financial position he would have been in had Five Star paid him two years'

severance.  Indeed, her emails to him explicitly stated that she was paying him "what you should have gotten from five star but did not get."  Rounding up, she wired him $238,000 on June 14, 2023.  Mr. McManamon, too, explicitly described the payment from Ms. Lerner as "severance."

12.     In August 2023, Mr. McManamon succeeded in obtaining the remainder of the two-year severance payment from Five Star that he had sought all along but failed to disclose to Ms. Lerner that he was still pursuing.  This undid the explicit basis on which Ms. Lerner provided him with the substitute severance payment.

13.     Indeed, Mr. McManamon never told Ms. Lerner that Five Star had paid him the full two years' severance.  She only found out by happenstance that he had received it.  She then immediately attempted to confront Mr. McManamon about his fraudulent conduct.

14.     When Mr. McManamon realized that Ms. Lerner had discovered his deceit, he began lying to Ms. Lerner and making excuses to avoid speaking with her, before cutting off communications with her entirely.

15.     Had Ms. Lerner known Mr. McManamon was actively pursuing the full two years' severance from Five Star, she would not have paid him $238,000 in substitute severance.

16.     Mr. McManamon has refused to return the $238,000 substitute severance payment he received from Ms. Lerner, resulting in a $238,000 windfall to him at Ms. Lerner's expense.

17.     Accordingly, Ms. Lerner is forced to bring claims for fraud, unjust enrichment, and conversion.  She seeks the return of the $238,000 she was improperly induced to pay Mr. McManamon, plus interest, costs, and fees.

## PARTIES

18.     Plaintiff Nancy Lerner is an individual who resides in Trabuco Canyon, California.

19.     Defendant Thomas J. McManamon is an airline pilot who resides in

Rocky River, Ohio.

# **FACTUAL BACKGROUND**

## **A. Mr. McManamon's Employment with Five Star**

20.    In 2005, Ms. Lerner introduced Mr. McManamon to Five Star, which was run by Ms. Lerner's mother, and Five Star hired him to be a private pilot.  Ms. Lerner does not now have, and has never had, any affiliation with or ownership interest in Five Star.

21.    Working for Five Star provided Mr. McManamon with substantial benefits, including the opportunity to earn a commercial pilot's salary while flying only a fraction of the annual hours.  For example, Mr. McManamon flew only 240 hours in 2014, 216.8 hours in 2015, 218.1 hours in 2016, 175.3 hours in 2017, 144.9 hours in 2018, 67 hours in 2019, 131.9 hours in 2020, 74.7 hours in 2021, and 77.1 hours in 2022.  A commercial airline pilot would have averaged 900 hours of flight time per year.[1]

## **B. Mr. McManamon Is Fired from Five Star**

22.    In October 2022, Mr. McManamon pursued a significant salary increase from Five Star.  To try to convince his employer that he was entitled to a raise, Mr. McManamon spent approximately $4,200 of Five Star's funds without authorization to pay for a study of pilot compensation that would support his claim that he was entitled to significantly higher pay.

23.    Mr. McManamon was fired from Five Star on December 12, 2022, and his misuse of company funds was among the reasons for his termination.

24.    Mr. McManamon was immediately disappointed by the terms of separation that Five Star was providing: six months' severance and no 2022 year-end bonus.

---

[1] https://www.bls.gov/ooh/transportation-and-material-moving/airline-and-commercial-pilots.htm#tab-3.

25.     Mr. McManamon repeatedly confided in Ms. Lerner by phone and text concerning what had happened.  He told her that he had been fired and complained that he was not going to receive his year-end bonus or more than six months' severance from Five Star.  He also told Ms. Lerner that, based on his years of employment with Five Star, he believed he was entitled to his bonus and severance equivalent to two years' salary.

26.     On December 15, 2022, Mr. McManamon sent Ms. Lerner a text message confirming that Five Star had improved the terms of his separation and he was now being paid his year-end bonus in addition to the six months' severance.  He also told Ms. Lerner that he was "really struggling" and asked her, "Is there anything you can help me with getting the proper severance?"

27.     Ms. Lerner replied that there was nothing more she could do to persuade Five Star to pay Mr. McManamon the two years' severance he believed that he was owed.

**C. Mr. McManamon Asks Ms. Lerner for Financial Assistance**

28.     On January 4, 2023, Mr. McManamon texted Ms. Lerner and, after complaining that he had not won the lottery, asked when they could "discuss [his] financial situation during this transition."

29.     Ms. Lerner replied that they had "never talked about finances," but offered to speak later that day.

30.     On that phone call, which occurred on or about January 5, 2023, Mr. McManamon again complained about his financial situation.

31.     Mr. McManamon had previously told Ms. Lerner that he was financially overextended, including because he had built a new house and had incurred costs related to a boat that he owned.

32.     Mr. McManamon told Ms. Lerner that he needed her help.  As a friend, she asked how she could help him.  In response, Mr. McManamon asked Ms. Lerner to pay him the eighteen months' severance he had not yet received from Five Star.

Combined with the six months' severance that Five Star had already paid him, that "substitute" severance payment would provide him with the full two years' severance that he believed Five Star should have paid him but would not do so.

33.    Ms. Lerner replied that if Five Star did not ultimately agree to pay Mr. McManamon the additional eighteen months' severance, then she would pay him the difference between two year's severance and the amount he ultimately received from Five Star.

34.    This was not the first time Ms. Lerner had helped Mr. McManamon with his finances.

35.    For example, in 2016, at Mr. McManamon's request, Ms. Lerner signed a Letter of Intent that Mr. McManamon had drafted, in which she agreed to employ him after her mother passed away if he was still working for Five Star at that time (among other conditions precedent), even though Ms. Lerner did not own a plane.

36.    Ms. Lerner had also provided the collateral for a $150,000 bank loan for Mr. McManamon and his wife.

37.    Thus, Ms. Lerner's offer to help Mr. McManamon financially was consistent with the generosity and kindness that she had historically shown him as a friend.

**D. Ms. Lerner Pays Mr. McManamon Eighteen Months' Substitute Severance After Mr. McManamon Deceives Her**

38.    Over the ensuing months, Mr. McManamon and Ms. Lerner were in regular contact by text and phone.  Among other things, Mr. McManamon complained about the difficulty he was having finding a new job, and Ms. Lerner provided him with moral support.  He described Ms. Lerner as "an unbelievable human" and "the best around!"

39.    When Mr. McManamon finally found a job as a pilot with United Airlines ("United"), he wrote to Ms. Lerner, "It is not what I want to do but right now it's all I have.  We are struggling with our bills and need health care so this is a

quick fix.  My long term goal is to try to find another career as quickly as possible.
Thanks for all you[r] support."

40.     Ms. Lerner responded with words of encouragement: "Hang in there…
Proud of you… Call me anytime if you need to talk…."

41.     As Mr. McManamon began working for United, Ms. Lerner periodically
checked in on him.  Mr. McManamon began speaking more positively about his new
job as time went on.

42.     But at no time did Mr. McManamon tell Ms. Lerner that he was
continuing to pursue the balance of a two-year severance payment from Five Star,
including by sending text messages directly to Ms. Lerner's mother, who owned Five
Star and controlled Mr. McManamon's compensation.

43.     On March 12, 2022, Mr. McManamon texted Ms. Lerner's mother after
seeing her at a wedding: "It was really nice to see you yesterday…. I wanted to see if
you and I could possibly meet this week?  I don't like how things ended with us after
almost 20 years and believe a conversation would be beneficial for both of us."  She
replied, "…As regards your no longer being with us professionally I want to assure
you that I have no hard feelings….  I know you will find a great new position and I
know you will make a success of it."

44.     On May 5, Mr. McManamon texted Ms. Lerner's mother again: "I have
just received word that I will be starting a new job the first of June with United
Airlines.  I will be taking an extremely large pay cut for at least the next 3 years.
This hardship is causing a lot of stress and sleepless nights as we navigate these
difficult times.  I don't believe it was your intention to have my family struggle after
almost 20 years of dedicated service to you.  I am asking you to please consider
extending my severance to the 2 years like you have extended to past employees?
Please help us through these difficult times."

45.     On May 11, Ms. Lerner's mother replied by text: "Congratulations on
your new position.  We have discussed trying to help and I would ask that you send

me some information detailing your total compensation. (salary and bonus, and any other form of compensation.) for each of the next three years.  This will help us understand your situation.  Finally, I am unclear about the two-year severance you have referenced I'm not familiar with this policy."

46.    Mr. McManamon replied the same day, "Thank you for considering.  I will send over some information later next week."

47.    On May 22, Mr. McManamon texted Ms. Lerner's mother, "I have the information we discussed [pertaining to my compensation at United].  …Would you like me to send it to [your assistant]?"  Ms. Lerner's mother replied, "Yes please send to [my assistant]."

48.    That day, Mr. McManamon sent a letter to Ms. Lerner's mother.  In the letter, Mr. McManamon wrote, "Per your request I have gathered the following information.  …When you leave [one piloting] job for another you are required to start at the bottom, and it takes years to get back up to your original pay."  Mr. McManamon provided a chart showing what he expected to earn in his first four years at United and juxtaposed that with a chart showing his compensation for the prior two years at Five Star.  He also provided a screenshot of the United Pilot Agreement showing what his hourly pay would be for the next 12 years, explained that pilots had received $5,000 in profit sharing in 2022, and that his benefits at United (including 401k contributions) were comparable to those he had received at Five Star.  Among other things, he complained in the letter to Ms. Lerner's mother that he would only have fourteen years to save for retirement, that he would not be promoted to captain for at least five years, and that he was the oldest person in his class at United.  He concluded, "Thank you again for your time and for helping my family get thru these difficult years."

49.    Mr. McManamon followed up with Ms. Lerner's mother on June 2, texting her, "I sent the information we discussed over to [your assistant] last week let me know if you need any additional information."

50.     Then, on June 12, Mr. McManamon followed up with Ms. Lerner's mother again, texting, "I sent the information you requested to [your assistant] a few weeks back let me know if you need any additional information."  Ms. Lerner's mother confirmed, "[Y]es, I did receive the information you sent."

51.     The same day—June 12—without telling Ms. Lerner the material fact that he was still actively pursuing the balance of the two-year severance payment from Five Star, Mr. McManamon emailed Ms. Lerner and asked her for the payment she had offered in January.

52.     Mr. McManamon wrote to her by email: "Thank you again for stepping up and helping us through these difficult times.  I can always count on you!  My severance with [Five Star] ends at the end of June.  I know you are going out of town soon so I wanted to see what you need from me to continue it as discussed.  It is really difficult for me to ask but we are so thankful that you have offered.  I hope some day I will be in a position to help you."

53.     By stating that, "My severance with [Five Star] ends at the end of June," Mr. McManamon falsely conveyed to Ms. Lerner that his negotiations with Five Star had definitively concluded and that he would not receive any additional severance from his former employer.

54.     Ms. Lerner replied the same day to ask Mr. McManamon how much he had been earning at Five Star, and he replied with "$255k plus $35k Bonus."

55.     Ms. Lerner again replied the same day, memorializing the terms of her commitment to provide "substitute" severance and providing a detailed explanation of the payment she planned to make to him:

> I am glad I can help.
> How I am doing the math and what I thought we talked about is as follows.
> You were making 251,560.92 a year (12 months)
> [F]or 2 year severance the number should be 503,121.84.
> They gave you 6 months severance which was 125,780.46 already paid to you.

COMPLAINT

> 503,121.84 – 125,780.46 = 377,341.38 is what you should have gotten from five star but did not get.
> I was willing to try to make you whole by giving you the difference of 377,341.38 minus what you are getting from United.
> If you tell me what you are getting from United we can do the math and send you the money.
> I was not including your bonus as that is not typically part of severance.
> Just FYI, the money you are getting from me is tax free as a gift, (which by the way, is costing me whatever I give you plus 40% in gift tax).
> Since what I am giving you is tax free, you end up making more than what you made last year net including your bonus.
> Let me know what you are making at United and I will wire you the money asap.

56.     Ms. Lerner's email made clear that, as she had told Mr. McManamon, she was stepping in to pay him the severance that he said he was being wrongfully denied by Five Star.  That is why Ms. Lerner explicitly stated that she was paying him "what you should have gotten from five star but did not get."  There was no other basis for Ms. Lerner's payment other than as substitute severance.

57.     Mr. McManamon responded with a chart of his projected annual compensation from United, which Ms. Lerner accepted at face value, and a chart showing his compensation from Five Star in the prior two years.  These were the same charts that Mr. McManamon had sent to Ms. Lerner's mother on May 22.

58.     The next day, on June 13, Ms. Lerner emailed Mr. McManamon to confirm the total amount that she would pay him, clearly reiterating the bases for her calculation:

> After doing all the math I will be giving you **$237,553**.
> You were making **GROSS 251,560.92** a year (12 months)
> [F]or 2 year severance the **GROSS** number should be **503,121.84**.
> They gave you 6 months severance which was **125,780.46** already paid to you.
> **503,121.84 - 125,780.46 = 377,341.38** is what you should have gotten from five star but did not get.
> **377,341.38 – 139,788** from United = **237,553** this is the number I will give you.

See below for the math on a **NET** basis which includes your bonus.

2 year net = 207,500 x 2          $415,000 **
Net rec'd from Five Star Severance     (81,334)
Net rec'd from Nancy              (237,553)
United Salary minus taxes (Estimate)
(139,788 – 35% 48,926)             (90,862)
Deficit                      $5,251
 **Net last year including bonus was $207,500.22 – we added back the 401K contributions to get the number.  Your net with making the 401K was only $180,500 this is what you would have lived on.  We subtracted from the five star severance what you had to pay for COBRA.
Please send wire instructions and I will get it sent.

59.     Ms. Lerner's calculations on June 12 and June 13 each made abundantly clear that the payment to Mr. McManamon was not a random gift, but substitute severance explicitly tied to that portion of a two-year severance payment that he said Five Star had wrongfully denied him.  Ms. Lerner again explicitly stated to him, as she did in her June 12 email, that she was paying him "what you should have gotten from five star but did not get."

60.     Rather than respond with gratitude for her generosity, Mr. McManamon instead continued to complain about his financial situation in an email on June 13:

Let me try and wrap my head around this.  Give me a day please.  I appreciate all of this but I need to figure out what I'm doing after this money runs out.   I have at least 4-5 years of extremely low pay.   This will get me to 2025.  Severance normally does not take into account earnings.

I have minimal retirement contributions, no bonus and 13 1/2 more years to save for retirement.   I will have nothing saved to get thru the next few years unless I get another job.  I'm not getting ahead just surviving.  I'm like you a plan[n]er.

61.     In that email, Mr. McManamon explicitly acknowledged that Ms. Lerner's payment was not a random gift, but rather a substitute for the severance he said he had been wrongfully denied by Five Star, where he stated: "Severance normally does not take into account earnings."

62.     The next day, on June 14, Mr. McManamon wrote, "Thank you again

11

for helping us out." He provided wire instructions and ended with, "A Thousand Thanks."

63. Ms. Lerner wired the substitute severance to Mr. McManamon that day, generously rounding up to $238,000.

64. Upon receiving the funds, Mr. McManamon wrote to Ms. Lerner, "[T]hanks again this is a huge help."

65. But Mr. McManamon had not been truthful or forthright with Ms. Lerner about his dealings with Five Star, and intentionally concealed the status of those dealings from Ms. Lerner. Mr. McManamon did not disclose to Ms. Lerner that he was still actively negotiating with Five Star for the full two years' severance that he had been seeking.

66. Had Mr. McManamon been truthful with Ms. Lerner and disclosed that information to her, she would not have paid him $238,000 in June 2023.

67. Had Ms. Lerner known that Mr. McManamon was actively seeking the full two years' severance from Five Star, she would not have paid Mr. McManamon anything at all until his negotiations with Five Star definitively concluded: as she explicitly stated in the emails to him, she was only paying him substitute severance based on "what [he] should have gotten from five star but did not get."

68. Ms. Lerner only agreed to pay Mr. McManamon the eighteen months' substitute severance in June 2023 because he deceived her and deliberately caused her to believe that he would not be paid the full two years' severance from Five Star.

**E. Mr. McManamon Conceals Five Star's Payment of the Balance of the Two Years' Severance**

69. After he received the substitute severance from Ms. Lerner, Mr. McManamon continued pursuing the balance of a two-year severance payment from Five Star.

70. On July 5, while intentionally concealing that he had received the substitute severance from Ms. Lerner just three weeks earlier, Mr. McManamon

texted Ms. Lerner's mother: "My severance has now ended and we wanted to let you know that we were extremely thankful for it.  I was wondering if you had a chance to review the information I sent over concerning my current compensation and having to start over at 51 years old?  I was hoping you would consider extending my severance to get us thru the next few years."  Ms. Lerner's mother replied, "I know you are anxious about your compensation.  …  We're working on it."

71.     Although he was in regular contact with Ms. Lerner from June to August, he never once mentioned his continued efforts to obtain additional severance from Five Star.

72.     On August 1, Mr. McManamon again texted Ms. Lerner's mother and again intentionally concealed that he had received the substitute severance from Ms. Lerner: "I wanted to inquire if you… had made any decision concerning the compensation?"

73.     In early August, and just two months after Mr. McManamon received $238,000 in substitute severance from Ms. Lerner, Five Star agreed to pay Mr. McManamon the eighteen additional months of severance he had been seeking.

74.     Combined with the six months' severance he had already received from Five Star, this meant Mr. McManamon would receive two years' severance directly from his former employer, obviating the basis for Ms. Lerner's substitute severance payment.

75.     But Mr. McManamon never told Ms. Lerner that he was being paid the balance of the severance by Five Star.

**F.  Ms. Lerner Discovers Mr. McManamon's Deceit**

76.     On August 15, Mr. McManamon and Ms. Lerner were having a text conversation.  Then, unexpectedly, Mr. McManamon sent a text that was a non-sequitur, totally unrelated to anything in their conversation: "Okay.  Should I send out the FedEx with the original in the morning[?]"

77.     Mr. McManamon immediately followed up with, "Oops that was to my

brother.  I'm selling my boat."  This was a lie.

78.    Mr. McManamon's message was intended for Five Star and related to his executed severance agreement; it was not related to his boat.  Mr. McManamon lied to Ms. Lerner so she would not discover that he had received the full two years' severance from Five Star.

79.    Two days later, on August 17, Mr. McManamon was scheduled to fly to California as part of his work for United.  Prior to his misdirected text to her on August 15 (and subsequent lie), he had made plans with Ms. Lerner.

80.    But that morning, he texted Ms. Lerner to say that his flight to California had been delayed and he would instead be flying to Detroit.

81.    In fact, Mr. McManamon did come to California, notwithstanding the flight delay.  He was simply lying to avoid Ms. Lerner because he realized events had been set in motion that would reveal to her that he had received the full amount of severance he sought from Five Star, and he did not want to be confronted about his lies and having to return the substitute severance that Ms. Lerner had provided.

82.    Earlier on August 17, Mr. McManamon's wife had made a mistake: rather than mail Mr. McManamon's signed severance agreement to the Five Star office in New York, she sent a United Airlines 737 Flight Manual to the Five Star office in Cleveland.

83.    The Five Star employee in the Cleveland office who received the manual made inquiries to the Five Star office in New York about why Mr. McManamon would be sending Five Star a United Airlines 737 Flight Manual.

84.    The Five Star New York office told the Cleveland employee that they were indeed expecting a package from Mr. McManamon, but the package was to contain the executed copy of his new severance agreement providing for two years' severance, not a United Airlines 737 Flight Manual.

85.    The Cleveland employee, who knew Ms. Lerner had paid Mr. McManamon $238,000 only two months earlier as substitute severance, was

surprised to learn that Mr. McManamon had continued to seek the severance payment from Five Star and, further, that Five Star had agreed to pay it.

86.    The Cleveland employee immediately contacted Ms. Lerner and told her that Mr. McManamon was now being paid two years' severance from Five Star.

87.    Ms. Lerner expected that Mr. McManamon would call her to share the good news and return the substitute severance that she had paid to him.

88.    But Mr. McManamon never told her.  Days passed, and, on August 23, Ms. Lerner texted Mr. McManamon and asked him to call her.  Mr. McManamon did not respond.

89.    The next day, Ms. Lerner tried to call him.  He responded by text: "Sorry, I can't talk right now.  I'm flying."

90.    This surprised Ms. Lerner: earlier, before she had learned of his deceit, Mr. McManamon had told Ms. Lerner that he would be off that day as part of a six days on/six days off work schedule.  By text, she again asked him to call her.  Mr. McManamon responded that he had ended up with only two days off, rather than six. Ms. Lerner asked him to call her after his shift.

91.    Mr. McManamon then inadvertently texted Ms. Lerner a screenshot of their text conversation, which he obviously intended to send to someone else.  When Ms. Lerner asked if the screenshot had been meant for her, Mr. McManamon lied again, and told her that taking a screenshot of their conversation and sending it to her "[m]ust have happened when I put [the phone] in my flight bag."  Ms. Lerner replied, "travel safe looking forward to talking to you later."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26    92.    But Mr. McManamon continued to avoid Ms. Lerner.  She texted him

27  again on August 25, "I am really hoping we can talk today – let me know when you

28

COMPLAINT

are off work – Conversation won't take long – thanks." But Mr. McManamon again did not respond.

93.     Mr. McManamon's repeated avoidance of Ms. Lerner made clear that he knew it was wrong to solicit and retain the substitute severance that he had received from her through lies and deceit, but that he wrongfully intended to keep it anyway.

94.     After years of friendship with Ms. Lerner and repeatedly benefitting from her generosity, Mr. McManamon deceived her into paying him $238,000 in substitute severance, which he has no right to keep.

## COUNT I
### Violations of Cal. Civ. Code §§ 1709, 1710 (Deceit)

95.     Ms. Lerner incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

96.     When Mr. McManamon asked Ms. Lerner in June 2023 to pay him the difference between the six-months' severance Five Star had paid him and the two-years' severance he believed that Five Star owed him, he intentionally concealed the material fact that he was actively pursuing an agreement for two years' severance from his former employer.

97.     Mr. McManamon knew that Ms. Lerner would not have paid him the $238,000 in substitute severance had she known that he was still actively pursuing an agreement for two years' severance from Five Star. He intentionally concealed that material fact, misleadingly conveying that his negotiations with Five Sar had concluded and that he would not receive any additional severance from his former employer, because he wanted Ms. Lerner to pay him.

98.     Ms. Lerner was justified in relying on Mr. McManamon's deceitful conduct because he had been her close friend for many years. Further, Ms. Lerner did not have any basis for knowing that Mr. McManamon was continuing to actively

pursue a two-year severance agreement from Five Star because Mr. McManamon did not tell her.

99.   As a result of Mr. McManamon's intentional and fraudulent concealment of material fact, Ms. Lerner was induced to pay him substitute severance and damaged in the amount of $238,000, plus interest.

100.   Further, in August 2023, when Mr. McManamon succeeded in obtaining a two-year severance agreement from Five Star, he concealed that material fact from Ms. Lerner because he knew that she would expect him to return the substitute severance she had paid him.

101.   That is why, despite months of complaining to Ms. Lerner about not receiving the severance payment that he wanted from Five Star, Mr. McManamon failed to tell her when he finally obtained it, even though he and Ms. Lerner were in regular contact and he had innumerable opportunities to tell her.

102.   As in June 2023, Ms. Lerner was justified in relying on Mr. McManamon's deceitful conduct in August 2023 because he was her longtime friend and she had no basis for learning from anyone else that Five Star had agreed to pay him two years' severance.  Indeed, she only ever learned it by happenstance.

103.   As a result of Mr. McManamon's fraudulent conduct in obtaining and then retaining the substitute severance, Ms. Lerner was damaged by the loss of $238,000, plus interest.

## <u>COUNT II</u>
### Restitution for Unjust Enrichment (Quasi-Contract)

104.   Ms. Lerner incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

105.   Mr. McManamon received a benefit from Ms. Lerner in the amount of $238,000, which she explicitly described in writing as a payment to substitute for that portion of two years' severance to which Mr. McManamon believed he was entitled but that he had not received from Five Star.  Ms. Lerner's emails to Mr.

McManamon explicitly stated that that she was paying him "what you should have gotten from five star but did not get," and Mr. McManamon also described the payment in writing as "severance."

106.   Mr. McManamon obtained this benefit by intentionally concealing from Ms. Lerner the material fact that he was still pursuing a two-year severance payment from Five Star in June 2023, misleadingly conveying to her that negotiations with Five Star had concluded and that he would not receive further severance from his former employer, and by concealing the material fact that he ultimately received it in August.

107.   When Mr. McManamon obtained a two-year severance agreement from Five Star in August 2023, the payment he had fraudulently received from Ms. Lerner became an unjust windfall that he was obligated to return.

108.   The unjustness of Mr. McManamon's retention of the $238,000 is reflected in his deceitful conduct, including in connection with soliciting it in the first instance through deliberately misleading statements and omissions, his concealment of the fact that he received the payment from Five Star, and his avoidance of Ms. Lerner after he received the payment.

109.   Ms. Lerner has demanded the return of her $238,000, plus interest, and Mr. McManamon has refused, unjustly retaining that sum at Ms. Lerner's expense.

## <u>COUNT III</u>
### Conversion

110.   Ms. Lerner incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

111.   Mr. McManamon now exercises dominion over $238,000 (plus interest) that rightfully belongs to Ms. Lerner.

112.   Mr. McManamon wrongfully obtained that sum from Ms. Lerner by intentionally concealing the material fact that he was still pursuing a two-year severance payment from Five Star in June 2023 and causing her to believe that his

negotiations with Five Star had concluded and that he would not receive further severance from his former employer.

113.   Mr. McManamon has wrongfully retained the $238,000 from Ms. Lerner because he subsequently received the full two years' severance from Five Star, undoing the explicit basis on which Ms. Lerner provided him with the substitute severance payment.  Moreover, he intentionally concealed from Ms. Lerner the fact that he obtained the two-year severance payment from Five Star.

114.   As a result of Mr. McManamon's fraudulent and deceitful conduct, he has improperly obtained a $238,000 windfall at Ms. Lerner's expense.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Lerner requests that this Court grant the following relief:

1.   Entering judgment for Ms. Lerner on each of her claims;

2.   An order requiring Mr. McManamon to return the $238,000 to Ms. Lerner, plus interest accruing since June 2023, as restitution and/or damages;

3.   An award of punitive or exemplary damages;

4.   An order requiring Mr. McManamon to pay all of Ms. Lerner's costs and reasonable attorneys' fees; and

5.   Such other and further relief as this Court deems just and proper.

Date: March 28, 2024                    Respectfully Submitted,


By: /s/ *Amy Jane Longo*
    Amy Jane Longo
    David B. Hennes (*pro hac vice* to be filed)
    Matt Corriel (*pro hac vice* to be filed)


    Attorneys for Plaintiff
    NANCY LERNER

COMPLAINT